## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WILLIAM KLAWONN,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**YA GLOBAL INVESTMENTS, L.P. AND NEOMEDIA TECHNOLOGIES, INC.,**<br><br>**Defendants.** | Civ. No. 10-2108 (KM)<br><br>**OPINION** |

### KEVIN MCNULTY, U.S.D.J.:

This is an action for disgorgement of short-swing profits allegedly earned in violation of Section 16(b) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78p(b). William Klawonn, an investor in NeoMedia Technologies, Inc. ("NeoMedia") seeks to claw back profits realized by YA Global Investments, L.P. ("YA Global"), a fellow investor.

Before the Court is a motion for summary judgment by YA Global. (ECF no. 97) Klawonn cross-moves for summary judgment and also moves to supplement his complaint. (ECF no. 100) For the reasons discussed below, I will grant defendant YA Global's motion for summary judgment. I will deny Klawonn's motions for summary judgment and to supplement the complaint.

## I. BACKGROUND

I am by no means writing on a clean slate. Before this case was reassigned to me and to Magistrate Judge Hammer in 2012, District Judge Chesler and then-Magistrate Judge Shipp entered rulings in the case. Drawing on those earlier rulings, Judge Hammer and I, too, have written opinions in this case. (ECF no. 95) Familiarity with the background is assumed. I will here

1

summarize the facts and procedural history most relevant to the motions now before me.

### A. Factual Overview

NeoMedia, really a nominal defendant here, is a company that "provides a suite of software and hardware for processing ... barcodes in the mobile environment," such as applications for "mobile marketing, mobile couponing, mobile ticketing, and mobile payments." (ECF no. 37 ("Am. Cplt.") ¶ 8) YA Global is an investment fund that invests in public companies, including NeoMedia. (*Id.*) YA Global formerly operated under the name Cornell Capital Partners, L.P.

On August 24, 2006, NeoMedia issued to YA Global a $5 Million debenture, convertible to common stock (the "August 2006 CD"). On December 29, 2006, NeoMedia issued to YA Global a second, $2.5 Million debenture that was likewise convertible to common stock (the "December 2006 CD"). In connection with each convertible debenture, the parties entered into an Investor Registration Rights Agreement ("RRA"). Each debenture was subject to a "conversion cap." Each conversion cap barred YA Global from exercising its conversion rights to the extent that such exercise would result in YA Global's owning more than 4.99% of NeoMedia's outstanding common stock. Together, then, the caps would prevent YA Global from owning 10% or more of NeoMedia's stock. That 10% cap is most relevant here because a 10% beneficial ownership interest would trigger liability for short-swing trading under Section 16(b) of the SEA.

The debentures' RRAs set forth deadlines for registration of shares. The August 2006 CD required that NeoMedia obtain an effective registration of its common stock with the SEC no later than November 22, 2006. Failure to obtain that registration would constitute an "Event of Default." The December 2006 CD similarly required a registration statement by March 29, 2007, to avoid default. NeoMedia did not meet either deadline. For that default, NeoMedia was not necessarily to blame; registration of the shares depended upon action by the SEC. Nevertheless, if the shares were not timely registered,

NeoMedia was obligated under the RRA to pay YA Global liquidated damages.[1] Under the RRAs' default provisions, an event of default had another important consequence: YA Global would be relieved of the 4.99% conversion caps. Building on earlier rulings of Judge Chesler, I have already held that this "limitation of conversion" provision did not extinguish the conversion caps, but only suspended them until NeoMedia cured the default. (ECF no. 97 pp. 6–9, 11–12)

Eventually, the SEC issued a Notice of Effectiveness of registration of the relevant shares. That occurred, however, on November 7, 2007, well after the agreed deadlines. By that time, NeoMedia had already paid YA Global at least $1.3 million in liquidated damages. Thereafter, NeoMedia and YA Global entered into a waiver agreement, dated December 31, 2008, in which YA Global relinquished its right to collect further liquidated damages as a result of the late-registration default.[2]

### B.     Procedural Background

The original complaint in this action was filed on April 26, 2010. (ECF no. 1) YA Global moved to dismiss that complaint, arguing that Klawonn had not adequately alleged that YA Global was a beneficial owner of more than 10% of NeoMedia's common stock during the relevant period. Judge Chesler, citing the conversion caps (*i.e.,* 4.99% times two), agreed. On December 6, 2010, he granted the motion to dismiss without prejudice. (ECF no. 35)

Plaintiff filed an amended complaint on January 20, 2011. (ECF no. 37) YA Global again moved to dismiss. Judge Chesler partially granted that motion to dismiss on August 10, 2011. (ECF no. 59) Judge Chesler's decision addressed five theories under which plaintiff argued that the conversion caps were not in effect. Judge Chesler rejected all but one: that NeoMedia's defaults waived the conversion caps. He reasoned that once the deadline for registration

---

[1]      Those liquidated damages equal 2% of the liquidated value of the convertible debentures for each 30-day period of default, up to a maximum of 20% of the purchase price of the debentures. RRA § 2(c).

[2]      The damages waiver is discussed further in my earlier opinion. (ECF no. 95 p. 10)

had passed[3] without SEC action, NeoMedia was in default, the conversion caps were lifted, and YA Global's beneficial ownership could exceed 10%. He therefore allowed the case to proceed, solely on this "default theory." (*Id.*)

On October 10, 2011, in connection with a discovery dispute, the parties moved for "clarification" of Judge Chesler's August 10, 2011 decision. (ECF no. 64) The parties agreed that the conversion caps became ineffective upon default (*i.e,* failure to timely register the shares). They disagreed, however, as to whether that default was irrevocable, or whether the period of default ended when the shares were eventually registered. NeoMedia contended that its registration of the shares on November 7, 2007, though belated, cured the default and reinstated the conversion caps. If so, YA Global could not after that date convert either debenture to make itself the owner of more than 4.99% of the common stock.[4] YA Global contended, on the other hand, that the default was not curable, and that the conversion caps, once invalidated, could not be reinstated. With no conversion caps in place, there would remain the potential for an ownership share of greater than 10%, and hence the potential for short-swing profit liability, after November 7, 2007. This dispute affected the scope of discovery—specifically whether records dating from after November 7, 2007, were relevant.

On October 27, 2011, Judge Chesler clarified his previous ruling. He explained that his prior opinion neither ruled out nor "unconditionally allow[ed] discovery after [November 7, 2007]." (ECF no. 65 p. 1) He reasoned that it was possible, during the interregnum when the conversion caps were suspended, for YA Global to enter into transactions that pushed its beneficial ownership above 10%. If so, then such 10% ownership theoretically could have remained

---

[3]     That deadline for registration was November 22, 2006, under the August 2006 RRA and March 29, 2007, under the December 2006 RRA. It seems the first deadline is the one that matters, since the lifting of the first conversion cap would have been sufficient to permit YA Global to gain beneficial ownership of more than 10%.

[4]     With the caveat that YA Global could theoretically have *already* entered into transactions before the caps were restored that would push its ownership share above 10%. *See infra.*

in place even after the conversion caps were restored on November 7, 2007. If that occurred, then post-November 7, 2007 trades could be subject to the short-swing provisions of Section 16(b). And if so, then discovery of those post-November 7, 2007 trading records would be relevant. (*Id.*) If, on the other hand, YA Global had *not* as of November 7, 2007, "exercised its right to convert such that it actually owned more than 10% of NeoMedia stock, then … the reinstated conversion caps would have been effective to preclude subsequent § 16(b) liability." If so, then discovery of materials from after November 7, 2007 would not be relevant. (*Id.* at 2)

Unconvinced that Judge Chesler's decision fully resolved their dispute, the parties wrote another joint letter to Magistrate Judge Shipp. (ECF no. 68) Klawonn also moved to compel discovery of records dating from after November 7, 2007. (ECF no. 78) Before Judge Shipp addressed the issue, however, this case was reassigned to me and to Magistrate Judge Hammer.

On January 29, 2014, Magistrate Judge Hammer entered a written order denying Klawonn's motion to compel discovery of records dating from after November 7, 2007. Following the principles earlier laid down by Judge Chesler, he found that the November 7, 2007 registration "cured the defaults in the August 2006 and December 2006" CDs. The cure of the default restored the conversion caps and, as to each CD, "prevent[ed] YA Global from exercising its rights" to convert shares resulting in ownership in excess of 4.99% of the then issued and outstanding shares of NeoMedia common stock.[5] (ECF no. 86 pp. 2-3)

Klawonn then filed a motion to set aside Magistrate Judge Hammer's Order. (ECF no. 88). On February 3, 2015, I denied that motion. In my ruling, I explained that I agreed with Judge Hammer's ruling that "the removal of the conversion caps was in effect a suspension, which operated only during the

---

[5]     Magistrate Judge Hammer noted YA Global's point that plaintiff did not contest that trading records reflected that YA Global did not obtain more than 10% actual ownership of NeoMedia's common stock as of November 7, 2007. However, Magistrate Judge Hammer declined to rule on this issue, which was not addressed at oral argument. (ECF no. 86 p. 3 n.1) It is discussed in Section II.C, *infra*.

period of non-registration." (ECF no. 95 p. 7) Therefore, "[t]he default ended, and the conversion caps were reinstated, when the registration became effective on November 7, 2007." (*Id.*) Thereafter, YA Global could own more than 10% only if something had occurred during the interregnum of default to push its ownership above that threshold. Discovery of records from that default period (*i.e.,* from November 22, 2006, to November 7, 2007) would reveal whether that had occurred. Only if it had occurred would post-November 7, 2007 trading records become potentially relevant.

### C. Motions for Summary Judgment and to Supplement Complaint

#### 1.   Summary judgment: Issues and standards

On March 9, 2015, YA Global filed the current motion for summary judgment. (ECF no. 97) On April 3, 2015, Klawonn filed a cross-motion for summary judgment. (ECF no. 100) Now, the primary issue in dispute is whether the two-year time limitation that applies to Section 16(b) claims can be extended. The issue is significant because, as the parties appear to agree, the original complaint was not filed within two years after the relevant trades.

Klawonn argues that the two-year time limitation in Section 16(b) is an ordinary statute of limitations, subject to equitable tolling. The limitations period should be tolled, he says, because a reasonable investor would not have been on notice of the Section 16(b) violation immediately after it occurred.

YA Global has two responses. First, it says, this time limitation is not an ordinary statute of limitations, but a statute of repose. Such a statute of repose would require that Section 16(b) claims must be brought within two years of the relevant trades, without exception and without tolling. Second, YA Global contends that even if the period were subject to equitable tolling, such tolling would not be appropriate on the facts of this case. Klawonn, according to YA Global, was reasonably on notice of the facts underlying his 16(b) claims.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

(1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### 2.    Motion to supplement complaint

Klawonn requests in his brief (he does not technically move) that he be allowed to supplement his amended complaint. He seeks to add allegations relating to his theory that the conversion caps are "illusory," one of the theories that Judge Chesler rejected in his August 10, 2011 opinion.

FED. R. CIV. P. 15(d) provides that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Whether to permit a supplemental pleading is a decision within the Court's discretion. *See Owens–Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979). "Leave to file a supplemental complaint should be freely permitted in the absence of undue delay, bad faith, dilatory tactics, undue prejudice to defendants, or futility, and when the supplemental facts are connected to the original pleading." *Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 360-61 (D.N.J. 2000) (citing *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995)).

## II.    DISCUSSION

Summary judgment is granted in favor of YA Global. The primary disputes, and my resolution of them, are as follows:

(a) Whether Section 16(b)'s two year time limitation is a statute of repose, or an ordinary statute of limitations. I conclude as a matter of law that this is an inflexible statute of repose, not subject to equitable tolling.

(b) Assuming it is an ordinary statute of limitations, whether the facts justify equitable tolling. Because issue (a) is not free from doubt, I hold in the alternative that equitable tolling would not be appropriate on the facts of this case.

c) Whether Klawonn should be permitted to supplement his complaint to add allegations in support of a theory already rejected by Judge Chesler. The motion is denied on grounds of futility.

8

**A.      Whether the Section 16(b) Time Limit is a Statute of Limitations or a Statute of Repose**

At issue in this case is a single phrase in SEA § 16(b):

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner [of more than 10%] ... any profit realized by him from any purchase and sale ... within any period of less than six months ... shall inure to and be recoverable by the issuer ... Suit to recover such profit may be instituted ... by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request ... but *no such suit shall be brought more than two years after the date such profit was realized.*

SEA § 16(b), 15 U.S.C. § 78p(b) (emphasis added).

The United States Court of Appeals for the Third Circuit has defined a statute of repose as "[a] statute barring any suit that is brought after a specified time since the defendant acted." *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 194 n.6 (3d Cir. 2007). It is similar to a statute of limitations in that it encourages plaintiffs to diligently prosecute their actions in a timely manner. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183, 189 L. Ed. 2d 62 (2014). Unlike a statute of limitations, however, a statute of repose does not allow for equitable tolling "even in cases of extraordinary circumstances beyond a plaintiff's control." *Id.* Rather, a statute of repose reflects Congress's "judgment that defendants should be free from liability after a legislatively determined period of time, beyond which the liability will no longer exist and will not be tolled for any reason." *Id.* (internal quotations and citation omitted).

The issue is consequential here. The parties accept (at least *arguendo*) that YA Global's beneficial ownership of 10% of the shares (if it occurred) ceased, at the latest, on November 7, 2007, when (as I have held) the conversion caps were reinstated. Klawonn's original complaint was filed more than two years after that date, on April 26, 2010. The timeliness of Klawonn's claims therefore depends on whether the two-year limit is a statute of limitations that may be extended by equitable tolling.

### 1.   *Simmonds* and other case law

The U.S. Supreme Court dropped a hint in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 360 n.5, 111 S. Ct. 2773, 2780 n.5 (1991). There, the Court described the § 16(b) two-year limitations period as a "period of repose." *Id.* That statement, however, was clearly *dictum*, and has been cited as such.[6]

The Court again came close to speaking in 2012, when it split 4-4 over the very statute of limitations/statute of repose issue presented here. *See Credit Suisse Sec. (USA) LLC v. Simmonds*, — U.S. —, 132 S. Ct. 1414 (2012). *Simmonds* came to the Supreme Court from the Ninth Circuit, which treated the § 16(b) time limit as an ordinary statute of limitations. On that premise, the Ninth Circuit further ruled that the limitations period would be tolled until the public filing of the 16(a) statement disclosing beneficial ownership of more than 10% of shares, regardless of whether plaintiff actually knew or should have known of the conduct at issue. *Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1095-97 (9th Cir. 2011) The source of that *per se* tolling rule was the earlier Ninth Circuit case of *Whittaker v. Whittaker Corp.*, 639 F.2d 516 (9th Cir. 1981). Judge Milan Smith, Jr., writing for the Court, believed himself bound to adhere to the tolling rule of *Whittaker*. Nevertheless, he also filed a special concurrence in which he stated his belief that the § 16(b) limitation period is a statute of repose, and therefore not subject to equitable tolling at all. The U.S. Supreme Court granted certiorari.

---

[6]   *Lampf* was discussing limitations periods for other SEA causes of action—specifically, those governed by "a 1-year period after discovery combined with a 3-year period of repose." *Id.* at 359-60. In a footnote, the Court observed by way of comparison that Section 16(b) contains a "more restrictive exception" that "sets a 2-year rather than a 3-year period of repose." *Id.* at 360 n.5, 111 S. Ct. at 2780 n.5. *See also S.E.C. v. Rind*, 991 F.2d 1486,1489 (9th Cir. 1993)("With one exception, [the 1933 and 1934 Acts] ... provide[] for a one-year time period after discovery of the alleged securities violation combined with a three-year period of repose ... The single exception is section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), which only provides for a two-year period of repose."); *Anixter v. Home-Stake Prod. Co.*, 947 F.2d 897, 898 n.1 (10th Cir. 1991); *Weiss v. Altholtz*, Civ. No. 10-02609, 2011 WL 4538459, at *2 n.3 (N.D. Ill. Sept. 29, 2011).

In *Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414 (2012), the Court[7] "divided 4 to 4 concerning, and thus affirm[ed] without precedential effect, the Court of Appeals' rejection of petitioners' contention that § 16(b) establishes a period of repose that is not subject to tolling." *Id.* at 1421. The statute of repose question, then, was saved for another day. Assuming *arguendo* that equitable tolling applied, the Supreme Court nevertheless vacated and remanded, in effect abrogating the *Whittaker* rule that the Ninth Circuit had followed in *Simmonds.* The Ninth Circuit, said the Supreme Court, had erred in adopting a *per se* rule that the statute was tolled until the filing of a § 16(a) disclosure statement; it should have followed the traditional tolling test, which applies only where "a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *CTS,* 134 S. Ct. at 2183.

The Third Circuit has not spoken on the statute of repose issue, but the parties cite two cases from district courts within this Circuit that have.

In *Capitol First Corp. v. Todd*, Civ. No. 04-6439, 2006 WL 3827329 (D.N.J. Dec. 27, 2006), the district court followed decisions in the Second and Ninth Circuits that allowed for equitable tolling. *Id.* at *11 ("Although the Third Circuit has not addressed the issue, the Second and Ninth Circuits have held that equitable tolling applies to a Section 16(b) claim."). However, as YA Global points out, the tolling rule promulgated in those Ninth and Second Circuit cases—the *Whittaker per se* rule that claims are tolled until the filing of a § 16(a) statement—was unanimously rejected by the eight members of the Supreme Court participating in *Simmonds.*

In a far older case, *Carr-Consolidated Biscuit Co. v. Moore*, 125 F. Supp. 423, 431 (M.D. Pa. 1954), the district court reached the opposite conclusion. There, the court interpreted the timing provision as a statute of repose that could not be extended, reasoning:

---

[7]     Chief Justice Roberts did not participate.

> When [Congress] desired to have the limitation period postponed, it
> specifically said so … In view of the foregoing, considering the plain
> and unambiguous language of § 16(b), comparing it with §§ 9(e)
> and 18(c), it appears that Congress intended a different situation
> to prevail under 16(b). Based upon a fair interpretation of the
> section we conclude that the words mean exactly what they say.

*Id.* at 431-32.

Plaintiff also relies on a handful of district court cases from other
circuits, decided after *Simmonds*. Rather than reflecting any clear consensus,
those cases attempt to adhere to prior Circuit case law in the absence of clear
guidance from a split Supreme Court.[8] Such cases are therefore of limited use
here.

### 2.     Statutory interpretation

With case law background in mind, I will walk through the factors I find
most useful in resolving the dispute before me:  (1) the text of the statute, (2)
how that text compares with other securities law timing provisions, and (3) the
nature of liability under the statute. As evidenced by the Supreme Court's 4-4
split on this issue, there are arguments on both sides. On balance, however, I
am inclined to read the timing provision as a statute of repose that is not
subject to equitable tolling. In particular, I find Judge Smith's special
concurrence in the Ninth Circuit *Simmonds* case persuasive, and I refer to it
throughout my discussion.

I start, as always, with the text of the statute. *See generally CSX Transp.,*

---

[8]     *See Mercer v. Gupta*, 880 F. Supp. 2d 486, 489 n.3 (S.D.N.Y. 2012)("Since,
however, this Court determined that plaintiff's claim fails on the merits, it need not
address whether the statute of limitations now also barred his claim, or whether he
could still invoke equitable tolling."); *Sun River Energy, Inc. v. McMillan*, Civ. No. 13-
2456, 2015 WL 158837, at *6 (N.D. Tex. Jan. 13, 2015) ("[B]ased on the current state
of the law, and absent a definitive decision of the Supreme Court to the contrary, the
court holds that § 16(b)'s two-year period for filing suit is a statute of limitations, not a
statute of repose. The court also concludes, as in [a case decided before *Simmonds*]
that this statute of limitations can be equitably tolled."); *Chechele v. Morgan Stanley*,
896 F. Supp. 2d 297, 302-03 (S.D.N.Y. 2012)(noting that *Simmonds* overruled the
Second Circuit's previous tolling rule and dismissing plaintiff's claim for failure to
establish equitable tolling under traditional principles).

*Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 283, 131 S. Ct. 1101, 1107 (2011). Here, the time limitation that Congress included simply states that "no such suit shall be brought more than two years after the date such profit was realized." 15 U.S.C. 78p(b). "No such suit shall be brought" does not seem to invite equivocation. As Judge Smith wrote in his *Simmonds* concurrence:

> In my view, "no suit" means no suit, and "two years after the date such profit was realized" means two years after the insider's final profitable transaction, regardless of when—or even if—a Section 16(a) report is filed. The text of the statute sets a firm bar against Section 16(b) suits filed more than two years after the transaction is completed.

*Simmonds*, 638 F.3d at 1099 (Smith, J., specially concurring).

I am inclined to agree. Congress could easily have included language explicitly stating, or at least more strongly suggesting, that the two year time period is subject to tolling. For example, it could have provided (as in other sections of the SEA) that the time limit begins to run from plaintiff's discovery of the conduct or from the date of a particular SEC filing.[9] Or (as in other sections of the SEA) it could have enacted a dual time limit—a shorter discovery period, plus a longer "repose" deadline beyond which all claims are extinguished. For example, an action for violation of SEA Section 9 (manipulation of security prices) or Section 18 (misleading filings) must be brought within one year after discovery of the facts underlying the violation, and in any event within three years after the violation.[10] In contrast, Section 16

---

[9]    In *Simmonds*, the Supreme Court stated analogous reasons for rejecting the Ninth Circuit's equitable tolling rule. *Simmonds*, 132 S. Ct. at 1419-1420 ("Congress could have very easily provided that 'no such suit shall be brought more than two years after *the filing of a statement under subsection (a)(2)(C)*.' But it did not ... [T]he most glaring indication that Congress did not intend that the limitations period be categorically tolled until the statement is filed:  The limitations provision does not say so.") (emphasis in original).

[10]    *See* 15 U.S.C. § 78i(f)("No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."); 15 U.S.C. § 78r(c)("No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.").

does not contain a dual limitations/repose time limit. It states only that no suit
can be brought after two years. If Congress did not intend something different,
it is hard to understand why it adopted language so radically distinct from that
in other SEA sections. *See Carr-Consolidated Biscuit Co.*, 125 F. Supp. at 431
("[C]onsidering the plain and unambiguous language of § 16(b), comparing it to
§§ 9(e) and 18(c), it appears that Congress intended a different situation to
prevail under 16(b).").

In addition, as Judge Smith's concurrence highlighted, there is a strong
parallel between Section 16(b) and the repose component of the dual time
limitations governing the Sarbanes-Oxley Act. *See* 28 U.S.C. § 1658(b).

> This straightforward textual reading is further confirmed by
> comparing the language of Section 16(b) with the language of other
> statutes of limitations in our securities laws ... the general
> securities fraud statute of limitations added by the Sarbanes-Oxley
> Act of 2002, 16 Stat. 801, provides that securities fraud suits "may
> be brought not later than ... 5 years after such violation." 28
> U.S.C. § 1658(b)(2). The Supreme Court recently noted that this
> provision "giv[es] defendants *total repose* after five years." *Merck &
> Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1797, 176 L. Ed. 2d 582
> (2010) (emphasis added). There is little meaningful distinction
> between the language of 28 U.S.C. § 1658(b)(2) and Section 16(b)—
> one provides that suits "may be brought not later than ... 5 years
> after such violation," and the other provides that "no suit shall be
> brought more than two years after the date such profit was
> realized."

*Simmonds*, 638 F.3d at 1099 (Smith, J., specially concurring).

Finally, the statute-of-repose interpretation comports well with the
statute's no-fault liability scheme. Section 16(b) is a "strict liability" statute
that "imposes liability without fault within its narrowly drawn limits." *Gollust v.
Mendell*, 501 U.S. 115, 122, 111 S. Ct. 2173, 2178 (1991) (internal quotations
and citation omitted); *see also Mercer*, 880 F. Supp. at 489 (noting that § 16(b)
"imposes liability without fault" and does not require a "showing of actual
misuse of inside information or of unlawful intent") (internal quotations and
citations omitted); *Simmonds*, 132 S. Ct. at 1420 (finding the Ninth Circuit's
tolling rule "especially at odds with a provision that imposes strict liability on

14

putative insiders ... Had Congress intended this result, it most certainly would have said so").

The case before this Court illustrates § 16(b)'s no-fault scheme. Here, liability was triggered because of the SEC's delay in issuing a notification that the shares were registered. That delay had the effect of waiving the conversion caps—which were specifically intended to protect YA Global from incurring short-swing liability. Under such a harsh regime, argues YA Global, a defendant should be permitted repose after a reasonable period of time:

> Section 16(b) imposes an inflexible penalty on corporate insiders even if they are not at fault and third parties are unharmed. As Section 16(b)'s critics have noted, its disgorgement provision "is little more than a trap for the unwary." ... It makes no sense to allow individuals to be hauled into court years—or even decades—after they unintentionally violate Section 16.

*Simmonds*, 638 F.3d at 1100 (Smith, J., specially concurring). In short, Congress could well have thought that enough is enough, and have employed language to reflect that intent.[11]

To be sure, there are reasonable arguments in the other direction.

First, as to Congress's intent, Klawonn cites 16(b)'s language that its remedial aim is to "prevent[] the unfair use of information which may have been obtained by [a] beneficial owner." 15 U.S.C. § 78p(b). Plaintiff also points to Section 16(a) itself, which requires disclosure of a beneficial ownership interest of more than 10%, as evidence that Congress did not intend for potential defendants to easily avoid liability. (ECF no. 104 p. 3) There is no straight line, however, that runs from either of these provisions to a conclusion that Congress intended that the two-year time limit be extendable. Indeed, the

---

[11]    In addition, Judge Smith noted that in the initial version of the House of Representatives bill, Section 16(b) did not provide for a private right of enforcement at all. In contrast, the Senate's version provided a private right of action but included no statute of limitations. While the legislative history is "inconclusive," Judge Smith noted that "[i]t is reasonable to infer that the House negotiators, in reaching a compromise with the Senate over the inclusion of a private right of action, might have bargained to include a stringent statute of limitations to circumscribe that right of recovery." *Simmonds*, 638 F.3d at 1100 (Smith, J., specially concurring).

Supreme Court in *Simmonds* rejected the idea that Section 16(a) implicates "endless tolling" of 16(b) liability. 132 S. Ct. at 1420.[12]

Lacking a definitive Supreme Court ruling on the issue, Klawonn claims the benefit of the doubt: "At most there is a tie [between plaintiff's and defendant's positions] and in such circumstances, this court should follow the ordinary rule that, unless otherwise stated, federal law limitations period are customarily subject to equitable tolling." ECF no. 100-1 p. 11 n.5 (internal quotations and citation omitted); s*ee Young v. U.S.*, 535 U.S. 43, 49, 122 S. Ct. 1036, 1040, 152 L. Ed. 2d 79 (2002)("It is hornbook law that limitations periods are customarily subject to equitable tolling … unless tolling would be inconsistent with the text of the relevant statute.") (internal quotations and citations omitted). As discussed above, however, for a variety of reasons I find that the text of the statute reads as a statute of repose, which is inconsistent with the default application of an equitable tolling rule.

In sum, then, I find the above considerations most relevant and persuasive in interpreting the timing provision of Section 16(b). Based on the explicit language of the provision, the way the language compares to that of other sections of the securities laws, and the aim of the statute as a whole, I am inclined to read § 16(b)'s time restriction as a statute of repose.

Under that interpretation, the result is straightforward. Because the action was filed more than two years after the relevant trades, it is barred.

## B.   Equitable Tolling

Notwithstanding the foregoing, I recognize that the precedents of the

---

[12]    *Simmonds* itself was a case in which the need to report under 16(a) was not obvious, and was contested by the defendant. Under the old *Whittaker* rule, for such a non-reporting defendant, the limitations period would be tolled indefinitely and liability would presumably be perpetual, even if plaintiff knew the relevant facts. In any event, Section 16(b) is not intended as an enforcement mechanism for 16(a); a plaintiff has other modes of recourse for such a disclosure violation. *See Simmonds*, 638 F.3d at 1100 ("If the insiders do not file their reports, they may be held professionally, civilly, or criminally liable for failing to do so.") (Smith, J., specially concurring).

Supreme Court and the Third Circuit do not definitively settle the issue. Therefore, taking my cue from the Supreme Court's approach in *Simmonds*, I consider in the alternative whether, if this were a statute of limitations, equitable tolling would save Klawonn's causes of action. Such an alternative ruling will, I believe, present a fuller basis for appellate review and grant both parties scope to present their contentions. I hold that, even under the statute-of-limitations interpretation, plaintiff's claim would be time-barred.

Being equally divided, the Supreme Court in *Simmonds* felt itself bound (in that case only) by the Ninth Circuit's decision that equitable tolling was not ruled out as a matter of law. The Court nevertheless unanimously rejected the Ninth Circuit's categorical rule that the limitations period was tolled until the filing of a § 16(a) statement. "[E]ven assuming that the 2–year period can be extended, the Ninth Circuit erred in determining that it is tolled until the filing of a § 16(a) statement." *Simmonds*, 132 S. Ct. at 1419.

The Supreme Court reasoned that the "the most glaring indication that Congress did not intend that the limitations period be categorically tolled until the statement is filed" is that "[t]he limitations provision does not say so." *Id.* at 1420. The Court reasoned:

> Congress could have very easily provided that "no such suit shall be brought more than two years after *the filing of a statement under* [§ 16] *subsection (a)(2)(C)*." But it did not. The text of § 16 simply does not support [tolling until the 16(a) statement is filed].

*Id.* at 1419 (emphasis in original). Abrogating *Whittaker,* the Court remanded and instructed the lower courts to apply "the usual rules of equitable tolling." *Id.* at 1421.

Under those "usual rules," equitable tolling requires the plaintiff to establish "two elements: (1) *that he has been pursuing his rights diligently*, and (2) that some extraordinary circumstances stood in his way." *Id.* at 1419 (internal quotations and citation omitted; emphasis in original). Such tolling does not go on forever: for example, "when a limitations period is tolled because of fraudulent concealment of facts, the tolling ceases when those facts are, or

17

should have been, discovered by the plaintiff." *Id.* at 1420.

Like the Supreme Court, I will assume *arguendo* that the usual rules of equitable tolling apply.

### 1.   Diligent pursuit of facts

I first consider what Klawonn knew or reasonably could have found out, and when. The "facts" that a plaintiff must know, or could have uncovered by the exercise of diligence, are those that establish a cause of action. A cause of action under Section 16(b) requires "(1) a purchase and (2) a sale of securities (3) by ... a shareholder who owns more than ten percent of any one class of an issuer's securities (4) within a six-month period." *Levy v. Sterling Holding Co.*, 314 F.3d 106, 111 (3d Cir. 2002), *overruled on other grounds*, 544 F.3d 493 (3d Cir. 2008) (internal quotations and citation omitted). Ample facts supporting those four elements appeared in NeoMedia's SEC filings from 2006–07. Accordingly, I find that plaintiff should have discovered the facts underlying his Section 16(b) claim more than two years before he filed his original complaint on April 26, 2010. Therefore, equitable tolling does not save his claim.

### a.   10% beneficial ownership

The facts concerning YA Global's beneficial ownership were readily discernible from NeoMedia's SEC filings. Those filings disclosed the existence and terms of the August 2006 and December 2006 debentures, including the conversion caps and default provisions. For example, in its 8-K filed on August 30, 2006, NeoMedia disclosed that it had "entered into a Securities Purchase Agreement ... with Cornell Capital Partners, LP," and that pursuant to that agreement, Cornell Capital (now YA Global) would purchase $5 million worth of convertible debentures. (ECF no. 97-5 p. 3) The 8-K also stated that the parties had entered into a corresponding RRA. (*Id.*) Both the CD and the RRA were included as exhibits to the 8-K. (*Id.* pp. 7-41) The RRA stated that NeoMedia "shall use its best efforts" to have the registration statement declared effective within 90 days. (*Id.* p. 8) The CD laid out "Events of Default," including

NeoMedia's failure to timely register the shares. (*Id.* pp. 24, 26) It also said that the debenture would be convertible into common stock "at the option of the Holder," *i.e.*, YA Global. (*Id.* p. 27) In addition, under the heading "Certain Conversion Restrictions," it explained that YA Global could not convert shares if conversion would result in its owning more than "4.99% of the then issued and outstanding shares of Common Stock." (*Id.* p. 28). NeoMedia made parallel disclosures about the December CD in its 8-K filed on January 8, 2007. (*See* ECF no. 97-5 pp. 42-81)

Anyone interested could have determined whether the SEC had issued a registration statement for the shares. If the SEC had not done so, that person would be on notice that an event of default had occurred and that the conversion caps were lifted.

Nor is this simply a matter of what could have been inferred. NeoMedia's SEC filings affirmatively disclosed that an event of default had occurred, which waived the conversion caps in the August and December 2006 CDs. In its 10-K filed on April 3, 2007, NeoMedia explained the 4.99% conversion caps and noted that this "limitation will terminate under any event of default." (ECF no. 97-5 p. 84) That April 3, 2007 10-K then disclosed, more than once, that NeoMedia was in default on the August and December 2006 CDs and that the conversion caps were lifted.

With respect to the August 2006 CD, that April 3, 2007 10-K stated:

> NeoMedia is currently in default of the Investor Registration Rights Agreement ... because the registration statement to register the shares underlying the secured convertible debenture was not declared effective by the specified date. Due to the current default status, the Purchasers [YA Global] have certain material additional rights ... that did not previously exist. *Specifically ... [t]he requirement for the Purchaser to maintain an ownership interest in NeoMedia of less than 5% is terminated[.]*

(*Id.* p. 85) (emphasis added). The same language is repeated in another section of the 10-K. *See id.* p. 86. The event of default is then disclosed a third time.

*See* ECF no. 103-3 p. 7[13] (listing as an event of default "[f]ailure to timely file the registration statement covering the shares related to the conversion option, or failure to make the registration statement effective timely (*NeoMedia is in default of this provision*)") (emphasis added).

With respect to the December 2006 CD, the April 3, 2007 10-K includes language substantively identical to that excerpted above. It states clearly that the conversion cap is now ineffective: "The requirement for the Purchaser to maintain an ownership interest in NeoMedia of less 5% is terminated." (ECF no. 103-3 p. 14) In addition, it discloses:

> As of December 31, 2006, the Company [NeoMedia] was in default of this instrument ... As a result of the default, the holder of the securities could redeem the convertible debentures and preferred stock for cash at their discretion ....

(*Id.* p. 3)

Later SEC filings made by NeoMedia, such as its 10-Q filed on May 10, 2007, also disclosed that because of the default, YA Global was no longer subject to the 5% conversion caps. (*See* ECF no. 97-5 pp. 90-92)

Thus, SEC filings on August 30, 2006, January 8, 2007, April 3, 2007, and May 10, 2007 by NeoMedia unequivocally disclosed the nature of the CDs, including the conversion caps and default provisions. The filings also explicitly and repeatedly disclosed that default had occurred and that the conversion caps were no longer in place. It was clearly disclosed that as a result of the default, YA Global could convert its debentures into common stock at its discretion.

If an investor wished to calculate the percentage of NeoMedia's common stock that YA Global beneficially owned absent the conversion caps, that investor could find the necessary information in NeoMedia's public SEC filings. On their front pages, NeoMedia's 2006 and 2007 10-Ks and 10-Qs disclosed

---

[13]    Excerpts of certain SEC filings are contained within multiple ECF docket entries and are cited as such. For example, different excerpts from NeoMedia's April 3, 2007 10-K are contained within ECF nos. 97-5, 100-3, and 103-3.

the number of then-outstanding shares of NeoMedia's common stock. (*See* ECF no. 103-2 ¶¶ 2, 3, 20; ECF no. 103-3 pp. 2, 18; ECF no. 103-4 p. 49) Those filings also disclosed the number of shares into which the August and December 2006 CDs were convertible. (*See* ECF no. 103-2 ¶¶ 2, 3, 20; ECF no. 103-3 pp. 9, 15, 19; ECF no. 103-4 p. 51) Dividing the number of convertible shares into the total number of outstanding shares, one could arrive at a percentage. That percentage would reveal that, without the conversion caps, YA Global could convert its debentures into more than 10% of NeoMedia's outstanding common stock. Indeed, that is the very basis of Klawonn's claim that YA Global's beneficial ownership exceeded 10% of NeoMedia's shares.

All of the above disclosures were made more than two years before Klawonn filed his complaint on April 26, 2010. Klawonn himself relies on those public disclosures as a basis to allege Section 16(b) liability. The amended complaint cited the terms of the August CD and RRA regarding conditions of default. (*See* ECF no. 37 ("Am. Cplt.") ¶ 72) It also cites NeoMedia's April 3, 2007 10-K, which disclosed the default with respect to the August and December 2006 CDs. (*See id.* ¶ 93(b)-(d)).[14] In reliance on such documents, plaintiff alleged that "by November 22, 2006, NeoMedia defaulted on the terms of the August 2006 Convertible Debenture ... This default caused any prior conversion limitations to be terminated ...." (*Id.* ¶ 75) The complaint continued:

> The Company's failure to obtain an effective registration statement
> by November 22, 2006 constituted a default allowing YA Global to
> fully convert the August 2006 Convertible Debenture into
> approximately 92.6 million shares of Common Stock ... [and] to
> become the beneficial owner of approximately 267.6 million shares
> of Common Stock ... These 267.5 million shares of Common Stock
> constituted approximately 29.8% of the outstanding shares of
> Common Stock based upon the total of 897,194,732 shares
> outstanding as of March 19, 2007, as reported in the company's
> Form 10-K filed with the SEC on or about April 3, 2007.

(*Id.* ¶¶ 75-76) There is a palpable tension between the complaint's reliance on

---

14    Plaintiff's original complaint also cited NeoMedia's disclosure of the August 2006 default in its April 3, 2007 10-K. (*See* ECF no. 1 ¶ 43(b))

those filings and Klawonn's current assertion, for statute of limitations purposes, that the basis of a § 16(b) claim could not be inferred from those filings.

Public SEC filings were sufficient to place Klawonn on notice of YA Global's alleged 10% beneficial ownership stake. *A fortiori* they did not, in some extraordinary way, *prevent* Klawonn from discovering the basis of a claim for purposes of equitable tolling. This information was, or should have been, sufficient to place a diligent investor on notice that there was a 10% owner out there.

### b.    Purchase and sale within 6 month period

Public SEC filings also placed Klawonn on sufficient notice that YA Global purchased and sold NeoMedia stock during the period of default. NeoMedia's SEC filings from 2006-2007, which disclosed such trading activity, were filed publicly more than two years before Klawonn filed his original complaint on April 26, 2010.

For example, on November 9, 2007, NeoMedia filed a 10-Q which disclosed that YA Global had acquired shares of NeoMedia through conversions on November 29, 2006, June 19, 2007, August 16, 2007, October 24, 2007, and October 31, 2007. (ECF no. 97-5 p. 100) On June 21, 2006, and October 12, 2007, NeoMedia filed Forms S-3 and S-3/A. These filings disclosed the number of the shares of NeoMedia common stock that YA Global owned. (*Id.* pp. 103, 109)

Here, too, Klawonn's complaint relies heavily on the very disclosures that he now says were insufficient to place him on notice. For example, the Amended Complaint alleges:

> Based on the 31,731,320 shares of Common Stock owned by Cornell Capital prior to filing the June 2006 Form S-3, the 41,186,137 shares of Common Stock obtained upon converting Series C Stock between November 29, 2006 and August 16, 2007 and the 50,174,521 shares owned by Cornell Capital prior to the filing [of] the October 2007 Form S-3/A, Cornell Capital sold at

22

least 22,742,936 shares of Common Stock between the filings of
the June 2006 Form S-3 and the October 2007 Form S-3/A.
(Am. Cplt. ¶ 142(d))[15]

Plaintiff quibbles that he did not have all the information he needed to
calculate the profits that YA Global realized. But inability to do such a
calculation does not deprive a plaintiff of notice of a potential claim. Under the
principles cited above, equitable tolling requires something closer to an
information blackout, or acts to prevent discovery.[16]

Diligent or even not-so-diligent inquiry would have uncovered the
essential facts about the alleged short-swing trades in time to file a § 16(b)
claim within the two-year time limit.

### 2.    Extraordinary circumstances

The second component of equitable tolling is that "some extraordinary
circumstances stood in [the] way" of plaintiff's assertion of his claim within the
limitations period. *Simmonds,* 132 S. Ct. at 1419. In satisfaction of this second
requirement, Klawonn really just reasserts the first: something about
NeoMedia's SEC filings, he says, prevented him from recognizing his claims.
Having found NeoMedia's disclosures adequate to place Klawonn on notice, I
cannot find that the same SEC filings set up an extraordinary barrier to timely
assertion of a claim. Once Klawonn was aware of these facts, the clock was
ticking. *See Simmonds*, 132 S. Ct. at 1420 ("Allowing tolling to continue beyond
the point at which a § 16(b) plaintiff is aware, or should have been aware, of
the facts underlying the claim would quite certainly be *inequitable* and
inconsistent with the general purpose of statutes of limitations ....") (emphasis

---

[15]    Plaintiff's original complaint also cited the dates of YA Global's conversions of
NeoMedia's common stock, information that surely derived from the SEC filings cited
above. (*See* ECF no. 1 ¶ 62)

[16]    In his August 2011 decision, Judge Chesler found plausible the allegation "that
some portion of the ... shares acquired by conversion on November 29, 2006 were sold
within 6 months at a profit, thus coming within the scope of § 16(b)." (ECF no. 59 p.
11) Thus, in the amended complaint, apparently with no new information, Klawonn
not only could but did allege this element of a Section 16(b) claim.

in original).

Plaintiff argues that "even the most diligent" investor would have had difficulty recognizing § 16(b) liability because "YA Global did not make any of the required disclosures with the SEC relating to its ownership interest or trading in NeoMedia Stock during the Default Period." (ECF no. 100-1 p. 14) This is an apparent reference to the lack of a § 16(a) statement. His claim, moreover, is rather carefully phrased as one that the SEC filings were not "*specifically dedicated* to disclosing the ownership interest or trading activity of YA Global." (*See id.* (emphasis added).) It was not until January 2010, when YA Global made a Schedule 13D filing,[17] says Klawonn, that he was alerted to look into YA Global's ownership and trading. (*Id.* p. 16) The 13D may have constituted clearer notice, but the earlier filings constituted sufficient notice.

To that, Klawonn has several answers, all aimed at establishing that misstatements or incomplete disclosures in the SEC filings constitute "extraordinary circumstances" that prevented him from recognizing a potential § 16(b) claim.

First, Klawonn argues that NeoMedia mixed deceptive disclosures in with truthful ones. Specifically, he points to a few lines in NeoMedia's 10-K, filed on April 3, 2007:

> Section 16(a) of the Securities Exchange Act of 1934 requires NeoMedia's officers and directors, and persons who own more than ten percent of a registered class of NeoMedia's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission. Officers, directors and greater than ten-percent shareholders are required by SEC regulation to furnish NeoMedia with copies of all Section 16(a) forms they file. *Based solely on a review of the copies of such forms furnished to NeoMedia, NeoMedia believes that during 2006 all Section 16(a) filing requirements applicable to NeoMedia's officers, directors, and ten percent beneficial owners were complied with.*

---

[17]    A Schedule 13D filing discloses an investor's beneficial ownership of more than 5% of a voting class of a company's stock.

(ECF no. 100-3 p. 25) (emphasis added).[18]

The false implication, says Klawonn, is that any potential for § 16(b) liability is limited to investors who filed § 16(a) statements. NeoMedia allegedly knew that YA Global should have filed a 16(a) statement (based on the events of default that waived the conversion caps in the August and December 2006 CDs), and that it had not done so.

In context, I cannot find that this paragraph undermines NeoMedia's disclosures. In general, plaintiff had a responsibility to thoroughly review NeoMedia's filings. *See Matthews v. Kidder, Peabody & Co.*, 260 F.3d 239, 255 (3d Cir. 2011)("[I]nvestors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments."). Clear language about the event of default and the lifting of the conversion caps appears prominently beginning on page 5 of this 181-page filing. *See* ECF no. 100-3 p. 9[19] ("The conversion is limited such that the holder cannot exceed 4.99% ownership ... The limitation will terminate under any event of default ... As of December 31, 2006, the Company was in default of this instrument ...."); *see also* ECF no. 103-3 pp. 5, 7, 8, 14. Klawonn's short-swing theory has not yet been tested, but to the extent it is valid, these facts would have established the basis for it.

The statement that Klawonn now highlights appears on page 163 (ECF no. 100-3 p. 25), after those multiple disclosures of the conversion caps and defaults. Any investor taking note of that statement would have to understand it in the context of the clearly disclosed fact that the conversion caps were not

---

[18]    Plaintiff argues that NeoMedia's disclosures violate the "buried facts" doctrine. *See Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2011)("[A] disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed."). *Werner* was not a 16(b) action but rather a claim for 10(b) liability relating to materially misleading disclosures. *See Id.* at 292. Here, there is no claim under 10(b) that NeoMedia's SEC filings were materially misleading. In any event, I do not find that they were misleading in the context of plaintiff's 16(b) claim.

[19]    In this and all ECF citations, page numbers correspond to those on the ECF docket. These are not always the same as those in the original document.

currently in effect. Such indicia of increased beneficial ownership would have caused a diligent investor to review the other data points relevant to 16(b) liability. The relevant data are not buried; if anything, it is the marginally relevant, allegedly misleading sentence now cited by Klawonn that is inconspicuously tucked away.

Klawonn also argues that he faced "significant hurdles" piecing together 16(b) liability because the necessary facts were parceled out in numerous SEC filings. (ECF no. 100-1 p. 16) Assembling a Section 16(b) claim from these documents allegedly required the knowledge and sophistication of a "financial analyst." (*Id.* p. 17) Certain aspects of the claims, says Klawonn, required looking at "three separate SEC filings" and involved "extra effort and calculations." (*Id.* p. 15) I do not find this argument persuasive. The information here was not hidden in unexpected documents; it was disclosed in NeoMedia's SEC filings—10-Qs, 10-Ks, and the like. That is precisely where an investor is expected to look. *See Matthews*, 260 F.3d 255. Moreover, any required calculations consisted, not of elaborate quantitative number-crunching, but basic arithmetic—addition, subtraction, multiplication, division. Klawonn himself seems to have had no difficulty making such calculations, once he thought to look into the issue.

Klawonn's argument is not really that the facts were not disclosed; it is that they were not brought vividly to his attention. Equitable tolling requires more than "failure to flag." A diligent investor paying close attention to NeoMedia's filings would have been alerted to the potential for a § 16(b) claim within two years of these disclosures.

## C.     16(b) Liability Based on Actual Ownership

Thus far I have addressed liability arising from YA Global's beneficial ownership during the default period when the conversion caps were not in place (November 22, 2006 to November 7, 2007). Judge Chesler cautiously noted the potential for § 16(b) liability even after November 7, 2007, under certain circumstances. Specifically, if while the caps were suspended, YA

Global actually attained ownership of more than 10% of NeoMedia's outstanding common stock, it could have retained that ownership share even after the conversion caps were reinstated.

To close off this theoretical basis for post-November 7, 2007 liability, YA Global has submitted evidence that it never exceeded (or even came close to) 10% ownership before the caps were reinstated. Klawonn does not appear to dispute the point.[20] For the sake of completeness, I briefly address it.

YA Global has submitted a spreadsheet from its investment adviser, Yorkville Advisors, reflecting all of its transactions in NeoMedia common stock between October 23, 2006 and November 21, 2007. (ECF no. 97-3 pp. 16-18) The spreadsheet shows the number of NeoMedia shares YA Global owned, as well as its resulting percentage ownership of the total outstanding shares of NeoMedia common stock, after each transaction. The spreadsheet and the corresponding affidavit from Yorkville's Chief Compliance Officer, Steven Goldstein, reflect that the largest percentage of NeoMedia common stock YA Global ever owned during the period of default was 4.92% on October 31, 2007. (ECF no. 97-3 p. 10 ¶ 16; *id.* pp. 16-18) On November 7, 2007, the date the default was cured, YA Global owned only 3.92% of NeoMedia's outstanding common stock. (ECF no. 97-3 p. 10 ¶ 18; *id.* pp. 16-18) YA Global has also submitted an account statement from its broker, Sloan Securities, to corroborate Yorkville's records. (ECF no. 97-3 pp. 41-44) Klawonn has submitted no contrary evidence regarding YA Global's actual ownership of Neomedia's common stock. Nor has he attempted to poke holes in the evidence that YA Global has put forth.

---

[20]     *See* ECF nos. 97-2, 101 ¶¶ 25 (admitting that the spreadsheet submitted by YA Global reflects that "the highest percentage of NeoMedia shares that YA Global obtained in the period of default was 4.92%"); ECF no. 101 ¶ 26 (stating that the percentage of common stock YA Global owned is "not material to this action because beneficial ownership is computed based upon, among other things, the right to convert other securities into Common Stock"); ECF no. 104 p. 6 (acknowledging that "sales after November 6, 2007 should not be included in the damage calculation"); *id.* 8 n.6 ("YA Global never having actually owned 10% of NeoMedia stock is also irrelevant to the analysis.").

On this record, I am convinced that there is no material issue in dispute as to YA Global's actual ownership of NeoMedia common stock during the period of default. YA Global has demonstrated that it did not come to actually own more than 10% of NeoMedia's common stock before the conversion caps were reinstated on November 7, 2007. Accordingly, I reconfirm that plaintiff's Section 16(b) claim cannot rely on any short-swing trading profits after that date.

### D.   Requests to reconsider earlier ruling or supplement the amended complaint

Klawonn, in his brief, seeks to set aside Judge Chesler's decision of August 10, 2011 (ECF no. 59) as erroneous, and also seeks leave to supplement the amended complaint. Those interrelated requests are motivated by the same goal—undoing Judge Chesler's previous decision limiting plaintiff to one theory of 16(b) liability. Both will be denied.

#### 1.   Motion to reconsider earlier ruling

In opposition to YA Global's motion for summary judgment, Klawonn asks the Court to revisit Judge Chesler 2011 ruling in which he rejected the theory that the conversion caps are "illusory." (ECF no. 100-1 pp. 20-22) Plaintiff argues that Judge Chesler's decision was "clearly erroneous" and asks this Court to reverse it. (ECF no. 104 p. 9) [21]

In his decision of August 10, 2011 (ECF no. 59), Judge Chesler rejected Klawonn's alternative theory that the conversion caps were "illusory," *i.e.*, unenforceable. In support of that theory, Klawonn submitted an amicus brief filed by the SEC in an unrelated case. That amicus brief, said Klawonn, demonstrated that the SEC had taken a policy stand under which these conversion caps would be unenforceable. Judge Chesler rejected this

---

[21]   This argument is not presented as a motion, but as a point in Klawonn's brief in opposition to summary judgment. Construed as a motion for reconsideration, plaintiff's request is plainly untimely. Under L. Civ. R. 7.1, a motion for reconsideration must be filed within fourteen days of entry of the order or judgment. Judge Chesler entered his opinion and order in August 2011. (ECF no. 59)

argument, finding it to be "very weak." (ECF no. 59 pp. 7–8)[22]

As explained in my prior opinion, Judge Chesler's decisions constitute the law of the case. *See generally Geibel v. United States*, 667 F. Supp. 215, 218-19 (W.D. Pa. 1987), *aff'd*, 845 F.2d 1011 (3d Cir. 1988)("The doctrine of law of the case provides that when one district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision.") (citation omitted). Judge Chesler's ruling was clear: "Insofar as the Amended Complaint asserts a claim under [the] default theory, it survives dismissal. The case may proceed on this theory only." (ECF no. 59 p. 13) That August 2011 ruling established the ground rules that have governed the litigation of this dispute for nearly five years. To undo it now would recast the issues and require reopening of discovery. If there were good reason, I would however reluctantly do so; I have reviewed Judge Chesler's ruling, however, and I see no error.

Klawonn has failed to demonstrate that Judge Chesler's decision was erroneous. Particularly in light of strong law-of-the-case considerations at this late date, I will not revisit it.

### 2.    Motion to supplement complaint

Klawonn seeks to supplement the amended complaint under FED. R. CIV. P. 15(d). This request comes in a brief submitted in opposition to summary judgment, nearly five years after plaintiff filed his original complaint, and more than four years after the filing of the amended complaint. Klawonn seeks to add relevant facts that occurred after the amended complaint was filed.

Klawonn proposes to supplement the amended complaint to add two new factual scenarios. First, Klawonn seeks to add an allegation that in 2014 another NeoMedia convertible debenture holder waived a 4.99% conversion

---

[22]    The case was *Levy ex rel. Immunogen Inc. v. Southbrook Intr'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001). Judge Chesler noted that the SEC took no position on the conversion caps in that case, merely listing some factors that "may" bear on their enforceability. The Second Circuit did not rely on the SEC's list of factors in deciding the issue. (ECF no. 59 pp. 7-8)

cap. (ECF no. 100-1 p. 24; 100-3 p. 254-55 ¶ 131) That debenture holder was Delta Capital Partners LLC, not YA Global. (ECF no. 100-2 p. 8 ¶ 24(a)) Delta's waiver was allegedly disclosed in NeoMedia's Schedule 14C filed with the SEC on April 15, 2014. (ECF no. 100-3 pp. 254-55 ¶ 131) Second, Klawonn seeks to add allegations that "YA Global was able to distribute Series C Stock to its nominees in order to avoid the Conversion Caps['] purported 9.9% limit on voting." As a result, YA Global and others (deemed "nominees" by Klawonn only) voted a combined 69.93% of NeoMedia's shares in favor of a proposal to amend NeoMedia's certificate of incorporation. (ECF no. 100-1 pp. 23–24; 100-3 pp. 254-55 ¶ 131) These allegations, allegedly derived from the same April 15, 2014 SEC filing, are unrelated to the August and December 2006 CDs.

These new facts, says Klawonn, represent a "concrete example of the illusory nature of the Conversion Caps." (ECF no. 100-1 p. 24) He seeks to reopen his previously rejected theory that the conversion caps were "completely illusory," and therefore reopen the whole scope of potential § 16(b) liability both before and after November 7, 2007. (*See id.* pp. 24-25)

Whether to permit a supplemental pleading is a decision within the Court's discretion. *See Owens–Illinois,* 610 F.2d at 1189. Grounds for denying such a motion include undue delay, prejudice, and futility. *Hassoun*, 126 F. Supp. 2d at 360-61. Here, I find that supplementation would be futile. [23]

Most glaringly, allowing plaintiff to add these new allegations would be futile because, as discussed *supra*, the facts plaintiff seeks to add are not relevant to the single "default" theory of liability upon which Judge Chesler permitted the case to go forward. I have already denied plaintiff's request to reconsider that decision. This is not a factual update of a claim being litigated,

---

[23]    In addition, allowing plaintiff to supplement his complaint at this juncture would entail undue delay, and would cause at least some degree of prejudice to YA Global. Plaintiff argues that there is no prejudice because discovery has never taken place as to the time period after November 7, 2007. But to expand the allegations while summary judgment is pending, and to reopen discovery for an entirely new time period that was previously deemed irrelevant to the case, would certainly seem to place a burden on a defendant that has already been litigating this case for more than five years.

but an attempt to reinject one already dismissed.

Even assuming *arguendo* that the "illusory" theory is still in the case, these allegations do not materially aid Klawonn. With respect to the alleged waiver of the conversion caps, the alleged conduct did not involve YA Global in 2006–07, but another debenture holder, Delta, in 2014. With respect to the alleged voting power of YA Global and its "nominees," the new allegations likewise relate to behavior that allegedly occurred in 2014. They bear no obvious relation to the 2006–07 events at issue here.[24]

These are not the kind of allegations for which I would exercise my discretion to allow supplementation—particularly at this advanced stage of the litigation and in the face of the well-established law of the case. Plaintiff Klawonn's request to supplement the amended complaint, as well as the related request to set aside Judge Chesler's prior ruling, are denied.

## III. CONCLUSION

For the foregoing reasons, I will grant defendant YA Global's motion for summary judgement. (ECF no. 97) Plaintiff Klawonn's cross-motion for summary judgment is denied. (ECF no. 100) Klawonn's related requests to set aside Judge Chesler's earlier ruling and to supplement the amended complaint are also denied. An appropriate order is filed with this opinion.

Dated: May 6, 2016
Newark, New Jersey

**KEVIN MCNULTY**
**United States District Judge**

---

[24]   Klawonn also does not factually support his contention that the other investors who voted in favor of the proposal were YA Global's "nominees." In this respect, he appears to point to a disclosure in the Schedule14C, which states that "[t]he Merger ... was approved by obtaining written consent from seven holders of the Series C Preferred Stock." ECF no. 100-3 p. 78; *see* ECF no. 102 p. 8 ¶ 24(b)-(c). Voting the same way as YA Global, without more, would not render another shareholder YA Global's "nominee."